**United States District Court**
**District of Maine**

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

2023 SEP 28  P 1:16

DEPUTY CLERK

| |
|---|
| EC, a minor, by her next friends Thomas Klos, and 'Messina Guzman', |
| Plaintiffs, |
| vs |
| Travis Works, Susan Muzzy, Susan Walters, Ashlee Savage, Hannah Wurgaft, Nathaniel Bessey, John Doe, Community Regional Charter School, Pender Makin, |
| Defendants |

**Jury Trial Demanded**

## Introduction

Plaintiffs brings this action pro se and without the assistance of legal counsel. The Plaintiff acknowledges that they are not trained as a lawyer and do not have access to a law library for legal research. As a result, certain aspects of this Complaint may not meet the caliber or quality that an experienced attorney might produce. The Plaintiff respectfully requests that the Court excuse any deficiencies in this initial filing and, if necessary, grant leave to amend the Complaint to address any deficiencies or to better articulate the claims and legal arguments as they become apparent through the course of litigation.

This civil action primarily centers around the enforcement of a Mediation Agreement that was reached on March 31, 2021, between the plaintiffs and defendants. This Mediation Agreement was part of a Due Process Hearing Request initiated by the plaintiffs under the Individuals with Disabilities Education Act (IDEA) and was intended to address various concerns the plaintiffs had regarding the education of their child.

In addition to enforcing the Mediation Agreement, this civil action also aims to rectify injustices that occurred under the color of state law which are secondary to the Mediation Agreement. These issues implicate other United States statutes, including the Americans with Disabilities Act (ADA), the Family Educational Rights and Privacy

Act (FERPA), and Title 42 USC §§ 1983 and 1985.

Of particular significance is this Court's interpretation of applicable state and federal statutes to ensure that going forward, all parties involved can work together effectively in pursuit of providing a Free Appropriate Public Education (FAPE) for EC. The plaintiffs are also seeking damages for the actions of the defendants and to discourage future lapses in their educational responsibilities to EC.

As of the date this complaint was signed, EC is still missing school, and defendants are actively refusing to provide EC with appropriate transportation, effectively denying EC her right to a Free Appropriate Public Education and the special education services and accommodations she's entitled to under the IDEA.

### Parties

1.    EC is a 13-year-old child enrolled in the Community Regional Charter Schools district. EC attended Dimensions Academy in Cornville, Maine, until June 2023, and is currently a student at Overman Academy in Skowhegan, Maine, for the 2023-2024 school year. EC received diagnoses of ADHD in 2015, autism in 2017, and anxiety in 2014, and these diagnoses remain current. EC is an individual with a disability as defined by the ADA.

2.    'Messina' Guzman ("Guzman") is EC's biological mother of EC and has been a resident of Maine at all times relevant herein.

3.    Thomas Klos ("Klos") is EC's father and has been a resident of Maine at all times relevant herein. Thomas has a disability characterized by intermittent paralysis, for which he has received ongoing medical care, including treatment by a neurologist, since being hospitalized in 2016. Additionally, Thomas also has autism and Generalized Anxiety Disorder, which impacts his day-to-day social interactions. Klos is an individual with a disability as defined by the ADA.

4.    Travis Works ("Works") is and has been the Executive Director aka Superintendent of the Community Regional Charter School district at all times relevant herein.

5.    Susan Muzzy ("Muzzy") is and has served as the Principal of Dimensions Academy within the Community Regional Charter Schools district at all times

relevant herein.

6.  Susan Walters ("Walters") has been serving as the Director of Special Education for the Community Regional Charter School district from approximately June 2021 to the present day.

7.  Ashlee Savage ("Savage") has been serving as an administrative assistant at Dimensions Academy, of the Community Regional Charter School district at all times relevant herein.

8.  Hannah Wurgaft ("Wurgaft") is a lawyer with the law firm Brann & Isaacson, which maintains an office in Lewiston, Maine. Brann & Isaacson has been retained by the school board of Cornville Regional Charter Schools to provide legal advice and representation services for the defendants.

9.  Nathaniel Bessey ("Bessey") is also a lawyer with the law firm Brann & Isaacson, and he collaborates with Hannah Wurgaft to offer legal advice and representation services for the defendants.

10. John Doe is a fictitious name used to represent any unnamed individual involved in, facilitating, enabling, or directing any of the acts described in this complaint, the identity of whom is unknown to EC's parents at the time of filing this complaint. As the identities of other individuals become known, including those who are assisting and advising other defendants, this narrative should incorporate these additional names.

11. Community Regional Charter Schools ("CRCS") is a public school district in Maine whose purpose is to provide a Free Appropriate Public Education to students such as EC. CRCS, as a public entity providing educational services, is subject to Title II of the ADA.

12. Pender Makin ("Makin") has served as the Commissioner of the Maine Department of Education at all times relevant herein. The Maine Department of Education is the governmental branch responsible for overseeing public education across the state of Maine. Maine Department of Education, as a public entity providing educational services, is subject to Title II of the ADA.

**Jurisdiction**

13.    The United States District Court for the District of Maine has jurisdiction over this civil action pursuant to the Individuals with Disabilities Act ("IDEA"), specifically Title 20 USC § 1415(e)(2)(F)(iii).

14.    This court also has jurisdiction over this civil action pursuant to Title 42, §§ 1983 and 1985, as the defendants, acting under the color of state law, deprived EC and the plaintiffs of their civil rights, including EC's right to a Free, Appropriate Public Education, access to her Special Education Services pursuant to the IDEA, and the right to have accurate information recorded in her education records, among other examples set forth in this complaint. Additionally, the defendants conspired together to deprive EC and the plaintiffs of their civil rights under the color of state law.

15.    The court also has jurisdiction over this civil action pursuant to the Family Educational Rights and Privacy Act ("FERPA", 20 U.S.C. § 1232g to the extent that defendants have knowingly maintained inaccurate educational records of EC, have consistently denied all requests for the correction of these records, have declined to conduct a FERPA hearing upon the plaintiff's request, and have indicated that if a FERPA hearing were to be held, it would be overseen by the same individuals who initially made the disputed determinations regarding EC's educational records.

16.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that the civil actions set forth in this complaint arise under the Constitution, laws, and/or treaties of the United States.

17.    This Court may have jurisdiction over the civil actions herein which pertain to EC's special education under 20 U.S.C. § 1415.

18.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 12131.

**Venue**

19.    Venue for this civil action lies in the United States District Court for the District of Maine pursuant to 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claims herein have occurred in the State of Maine.

**Statement of Facts**

**Pre-Mediation**

20.  EC attended the Acadia Pediatric Day Treatment Program in the fall of 2017,
     where EC received a prescription from child psychiatrist Eric Kuntz to address
     well-documented challenges with falling asleep, staying asleep, and adhering to
     a consistent sleep schedule.

21.  EC was in the process of recovering from abuse experienced at her previous
     school when she was transferred to CRCS in 2018 as a third grader. EC had an
     Individualized Education Program (IEP) in place pursuant to the IDEA from her
     previous school, and this IEP was transferred to CRCS. During EC's enrollment
     at CRCS, the district and EC's parents convened several "IEP Meetings" to
     discuss and review EC's progress and special education programming. This
     information was known to defendants when and subsequent to her transfer to
     CRCS.

22.  Initially, Guzman would drive EC to school, but only after ensuring that EC
     was in a mentally and emotionally ready state for the school day. The time
     required to prepare EC for school varied and depended on various possible
     factors. CRCS had and still maintains a policy that designates students as late
     for school if they arrive after 8:30 AM. Plaintiffs were reminded of this policy
     each day that EC arrived late to school.

23.  As it became evident to the plaintiffs that EC required additional attention and
     time each morning to prepare for school, they made a formal request for a "late
     start" accommodation. Specifically, the plaintiffs requested that EC be allowed
     until 9:30 AM — an hour later than the school's policy of 8:30 AM — before
being  considered late. Initially, the plaintiffs made this request to the district, asking for
     it to be included in the agenda for an upcoming IEP Meeting. Subsequently,
     they reiterated this request during each IEP Meeting.

24.  In subsequent IEP Meetings, the "late start" accommodation request was
     brought up for discussion, but CRCS prevented it from being formally
     included on the agenda, and it was never properly considered or
     documented. During these meetings, CRCS staff would inquire about the

plaintiffs' need for a "late start," and the plaintiffs provided comprehensive and detailed responses to CRCS's questions. Despite having a thorough understanding of EC's sleep-related difficulties, CRCS never permitted it to become a substantial topic of discussion during an IEP Meeting.

25.    As time passed, the defendants persisted in denying the "late start" accommodation, but they started providing more vocal and imaginative medical advice on how Guzman and Klos should handle EC's sleep-related issues. Plaintiffs noticed that the more they shared about EC's home life, the more unsolicited medical advice they received from the defendants.

26.    In response to plaintiffs' persistent requests for a "late start" accommodation, the defendants proposed conducting a Functional Behavior Assessment ("FBA") to "determine EC's need for such an accommodation". However, the defendants' arguments for FBA never made sense, but because it seemed that undergoing an FBA might potentially lead to the approval of the 'late start' accommodation, the plaintiffs were open to considering it. Despite alluding to the FBA, the defendants never articulated nor provided a clear explanation of what the assessment would entail or how it would be conducted. Consequently, no substantive progress was made in pursuing the FBA.

27.    Plaintiffs suspect that defendants raised the idea of the FBA as a means to deter plaintiffs from pursuing the 'late start' accommodation, assuming that plaintiffs might abandon their quest for it if enough hurdles were introduced. Defendants have not demonstrated a legitimate requirement for the FBA, nor have they ever asserted a legal necessity for it in good faith.

28.    Between 2018 and 2021, a series of events unfolded concerning EC's special education placement and progress, leading to a deadlock between the plaintiffs and CRCS. The plaintiffs believed that EC was not receiving the special education services to which she was entitled, and that the "IEP Meetings" were not being conducted in accordance with the IDEA. Consequently, in March 2021, EC's parents initiated a "Due Process Hearing" with the Maine Department of Education, Office of Special Services Dispute Resolution. This hearing request was assigned the case

number "21053.H," serving as the basis for this civil action. The 'late start' accommodation was one of several grievances plaintiffs sought to address through the Hearing process.

29.    In an email dated February 25, 2021, sent by Klos to Muzzy and Works, Klos submitted an accommodation request under the Americans with Disabilities Act (ADA) concerning the scheduling of EC's distance learning. Klos reminded defendants that even though EC was not physically attending classes in person, she still faced challenges related to sleep and maintaining a consistent schedule. The necessity for the 'late start' accommodation persisted even during the period of distance learning imposed by the lockdown. CRCS was urged to acknowledge and respect EC's difficulty in being prepared for early morning distance learning and to understand that changing EC's schedule abruptly was not feasible. Many autistic children, including EC, require a gradual transition when altering their routines and schedules. However, defendants never responded to this ADA accommodation request.

**Mediation Meeting, March 31, 2021**

30.    As part of the hearing process, EC's parents agreed to participate in a 'Mediation Meeting.' This Mediation Meeting took place on March 31st, 2021, with the following individuals in attendance:

   A.    Guzman - participated via a phone call.
   B.    Klos - also joined via a phone call.
   C.    Works (representing CRCS).
   D.    Additional support personnel and employees of CRCS and Brann & Isaacson, who were retained to assist and advise Works during the Mediation Meeting.
   E.    John Lemieux, an attorney from Portland, Maine, who served as the mediator.

31.    Following the Mediation Meeting, all parties involved reached an agreement. Subsequently, they signed the final two-page Mediation Agreement and submitted it to the Maine Department of Education, Office of Special Services

Dispute Resolution. As a result, Hearing request "Case No. 21053.H" was dismissed, and the terms of the Agreement became legally enforceable.

## Mediation Agreement, March 31, 2021

32.  The Mediation Agreement was drafted using a standardized form that included various fields and filled-in responses such as "Mediation Case #: 21.053.H," "Case Name: Klos v. Community Regional Charter School," the date, child's name, and other essential information related to the Mediation Meeting and the Department of Education.

33.  The Agreement comprises a total of nine parts drafted by the Mediator, each appropriately numbered. The following is a verbatim list of the Agreement terms:

1.  The school and the parents will develop a plan to allow late start for the child within the policies of the school building.

2.  The School shall arrange for a Functional Behavioral Analysis to evaluate the student's issues with morning starts to the school day and the results will be shared and discussed with the parents to develop a plan for the student.

3.  The parents will consent to a comprehensive Occupational Therapy Evaluation which will be ordered and conducted by the school. The results will be shared and discussed with the parents to develop a plan for the student.

4.  If the parents are not satisfied with the results of the OT Evaluation, the school will authorize and pay for an independent evaluation.

5.  At IEP meetings, the school will develop an agenda with the participation of the parents. After the meeting, the school shall provide a Written Notice documenting the discussion and the responses to the parents' concerns and/or requests.

6.  The school shall schedule an IEP with the agenda of reviewing documents, evaluations, and the agenda originally intended for the

December 2019 annual review, as well as any new documents or evaluations that have been developed regarding the student since that time.

7.    If the parents express a reasonable reason for not being able to attend a scheduled meeting, the school will agree to reschedule the meeting, provided that the parents cooperate to reschedule meetings and that a rescheduled meeting can be held within the requirements and timelines identified in MUSER. The school shall provide citations to those timelines when they are an issue. The parents agree to respond to communications from the school within three business days.

8.    The school district agrees to have all future IEP meetings with the administrator participating being personnel other than the current Special Education Director.

9.    The parents will withdraw the pending hearing request.

34.    At the bottom of the Agreement is a paragraph which reads: "Parents and adult students may seek enforcement of this agreement through the State complaint investigation procedure. They also have the option of seeking enforcement in a State court of competent jurisdiction or district court of the United States (MUSER XVI.3.B(8))."

**Plaintiffs' ADA Complaint filed with the United States Department of Education Office of Civil Rights**

35.    Defendants' failure to address plaintiffs' accommodation request dated February 25, 2021, led plaintiffs to submit a complaint to the United States Department of Education Office of Civil Rights ("OCR"). This complaint was filed in May 2021 and designated as Complaint No. 01-21-1546.

36.    During the investigation phase of the complaint, OCR obtained defendants' version of events but never contacted plaintiffs or provided plaintiffs with an opportunity to rebut defendants' answer to the complaint.

37.  OCR did not contact nor did they email plaintiffs again until October 5th, 2021, when they sent an email informing plaintiffs that they had dismissed the complaint. In the email, OCR explained that during their investigation, they had learned that "a due process hearing request was filed with the Maine Department of Education. Further, OCR learned that the parties resolved that matter in mediation on March 31st, 2021. As part of the mediation agreement, the parties agreed to 'develop a plan to allow a late start for Student within the policies of the school building.' Additionally, the School provided OCR with a copy of its September 20, 2021 email to [plaintiffs]. In that email, the School related to you that it did not previously respond in writing to [plaintiff's] February 25th, 2021 email, but the issues raised in your email were resolved through the mediation agreement reached on March 31, 2021, and the withdrawal of [plaintiffs'] due process hearing request on April 1, 2021. Accordingly, OCR is dismissing this complaint because it has been resolved."

38.  It was from the document dismissing the complaint that plaintiffs first learned that defendants were claiming that the accommodation request of February 25th, 2021 — a request made pursuant to the Americans With Disabilities Act — was somehow connected to the due process hearing request made pursuant to the Individuals with Disabilities Education Act that was filed in March 2021. Not only did defendants convince OCR that these were one and the same, but they also falsely asserted that the matter had been resolved, thus inducing OCR to dismiss the complaint.

39.  On a more technical level, the issue raised in the OCR complaint was whether ignoring an accommodation request pursuant to the ADA, in the context described in the complaint, constituted a form of discrimination actionable by OCR. The issues raised with the due process hearing request and then at the Mediation Meeting pertained to whether defendants were complying with the IDEA regarding plaintiffs' years of requesting a 'late start' accommodation. These are two separate matters involving distinctly different sets of circumstances. It is presumed that defendants, being represented by or being lawyers, knew this at the time they supplied OCR with their answer to plaintiffs' complaint.

40.    Defendants have asserted to the Maine Department of Education Office of Special Services and Inclusive Education, as well as the United States Department of Education, Office of Civil Rights, that they have "resolved" the matter of plaintiffs' "late start" accommodation. However, they have actively opposed it in practice, refused to honor it by any interpretation, and attempted to re-argue its validity with plaintiffs whenever plaintiffs have brought it up for discussion at any time subsequent to the mediation meeting.

**The Fraud, September 30, 2021, EC's absences**

41.    In September 2021, CRCS sent the plaintiffs a notice indicating their intention to convene an IEP Meeting. The IEP meeting notice only featured a checkmark in the box labeled "Other," accompanied by: "Program Review - Manifestation Determination." Unfortunately, there was no additional explanation provided for this meeting, and none of the plaintiffs were aware that the phrase "Manifestation Determination" held a specific significance within the context of Special Education. Even when the plaintiffs sought clarification from defendants, they received the same phrase repeatedly, without any indication that it carried an IDEA-specific meaning as it was being employed by the defendants.

42.    Before the scheduled "IEP Meeting," the plaintiffs had requested that additional matters related to EC's IEP be included on the agenda. However, the defendants denied these requests without providing an explanation. Additionally, the plaintiffs had requested that the meeting be recorded, and they believe that the defendants recorded the meeting in response to their request.

43.    On September 30, 2021, the day of the "IEP Meeting," the plaintiffs discovered that they were unprepared for the meeting, and the defendants were either unwilling or unable to clarify the appropriateness of the term "Manifestation Determination" or provide a clear explanation of the situation. Instead, the defendants interrogated plaintiffs about the reasons for EC's school absences, insisting on detailed and specific information. Plaintiffs refused to provide any details regarding EC's absences, knowing from past experience that defendants

sought this privileged information for an unrelated agenda and not for any purpose tied to EC's education or the IDEA. Despite this, the defendants persisted, threatening to make up and conclude what they wanted to believe, with the claim that if we don't prove otherwise, then they can infer anything they want.

44.    Even though we assert that the circumstances around EC's absences up until September 30, 2021 (and subsequently through October 11, 2022, with the exception of 6 days) are privileged, and defendants have no right to intrude and demand the details of the medical reasoning for EC's absences, the answer to defendants' question of whether the absences were related to EC's disabilities is "yes." All details relating to EC's absences have been discussed with her physician and healthcare providers but will not be shared with defendants without a legal requirement to do so.

45.    Following this meeting, defendants, in the absence of any evidence or information, concluded that EC's absences from school were unrelated to her autism/disabilities. This determination was purely speculative on the part of defendants, as the only potential sources of evidence were EC's parents, both of whom refused to discuss the matter or provide any details to defendants, and EC's doctors and healthcare providers.

46.    Defendants' misrepresentation of this meeting, labeling it as an "IEP Meeting" when it clearly was not, amounted to fraud. This meeting was not authorized by the IDEA, and the concept of a "Manifestation Determination" only applies when a child is accused of misbehavior, which was not the situation here. None of defendants' actions with regards to this meeting were authorized by the IDEA, nor were they conducted in good faith.

47.    In a "Written Notice" dated October 12, 2021, defendants indicated the following: In the section labelled: "Describe the action(s) regarding the referral, evaluation, identification, programming or placement proposed or refused by the SAU", defendants wrote: "The IEP Team met for program review for ["EC"]. The following was determined:  -  IEP team met to determine a manifestation of determination for ["EC"],  a learner with Autism due to

absences. - IEP Team majority ruled it was not a manifestation of disability nor was it due to the fact that the IEP was not being followed. - Procedural safeguards will be sent to parents with this written notice. A copy of the recording of this meeting will be sent to parents. - [EC's parents] did not agree with these determination." [sic]

48. In the subsequent sections of the "Written Notice," the defendants included various narratives that presented facts out of context, were incomplete, and consequently conveyed a different meaning from what had actually occurred. Additionally, they inaccurately quoted or paraphrased the statements made by the plaintiffs during the meeting.

**CRCS Inviting Unauthorized and Unnecessary To EC's IEP Meetings**

49. Defendants have frequently invited individuals to EC's IEP Meetings who do not meet the statutory requirements of 34 CFR § 300.321(a). Having these individuals present is not in the "best interests of the child," and their presence serves only to 'stack' the IEP team with individuals whose loyalty lies solely with the school district for the purposes of any voting done at the meeting. These additional attendees should not be permitted to attend IEP meetings.

50. An example of this is the meeting held by defendants on September 30, 2021. This meeting had three administrators present, even though there was no discussion being had that day that required the knowledge of an administrator (such as available district resources) or the unique perspective of an administrator. Defendants Walters, Muzzy, and Works, all administrators, were all present at this meeting, and the presence of Works as Superintendent clearly influenced other CRCS employees from speaking their mind and voting their conscience.

**Misuse Of "Manifestation Determination" Determination**

51. A significant time after receiving the "Written Notice" from the defendants, the plaintiffs discovered that the defendants were utilizing their own determination, specifically that EC's absences were not attributable to her autism or disability, for several inappropriate purposes:

A.    The defendants used their determination to deny EC special education services while she was absent. Defendants also said that the meeting was required "for the School Board", and said that EC could not receive special education services while absent from school.

B.    EC was denied access to her school-issued iPad and the opportunity to complete schoolwork at home, despite the defendants sending an email stating that students who were at home would receive schoolwork and their school-issued iPads to complete it. The defendants (through Muzzy) informed the plaintiffs that EC was being singled out for exclusion of policy.

C.    Relying on their determination from the September 30, 2021 meeting, the defendants insisted that the plaintiffs obtain and submit a doctor's letter to them. Failing to do so would result in them continuing to declare EC as truant despite receiving daily emails from plaintiffs. Plaintiffs informed the defendants on a daily basis that EC's absence was excused in accordance with Title 20-A § 3272(3)(A), which constitutes the full extent of what Maine statutes require for absences to be considered "excused."

D.    Despite this, the plaintiffs' refusal to obtain a note from a doctor and share it with the defendants resulted in Muzzy reporting the plaintiffs to the Maine Department of Health and Human Services ("DHHS") on October 7th, 2021. This report falsely alleged that EC was habitually truant.

In the subsequent days, all three plaintiffs met with an investigator from DHHS, explained the situation to the investigator, provided an example of the daily emails they were sending to the defendants, and responded to all of the investigator's questions. The investigator ultimately concluded that the defendants had abused the reporting process, characterized defendants' actions as "harassment", and acknowledged that the plaintiffs "had done nothing wrong." Upon returning to the office, the investigator closed the complaint referral

for the stated reasons.

52.   CRCS's actions and refusal to provide EC with special education services and general schoolwork while EC was kept home for medical reasons actually exacerbated EC's symptoms and disorders. CRCS has provisions in their district policy handbook stating that students who miss school not only can make up missed work at home but may be required to do so. Defendants refused to offer this equal protection option to EC and rejected plaintiffs' request for this option because plaintiffs opted not to comply with the unlawful, intrusive demands of defendants. Plaintiffs believe that defendants denied EC's access to make-up work was in retaliation for their asserting privacy and other rights with regards to defendants' overstepping.

53.   Each month thereafter, Ashley Savage would send the plaintiffs an "Attendance Audit." Each Attendance Audit displayed cumulative absences for EC, categorizing them as "unexcused" and asserting that EC was consequently labeled as "habitually truant." The plaintiffs responded to several of these emails, asserting that the defendants were exceeding their statutory authority and requesting the legal basis for their actions. The defendants' sole response was that the doctor's note requirement was a district policy, and they declined further discussion or reconsideration of EC's truancy status.

54.   The plaintiffs presented the defendants with a legal argument explaining why the defendants were incorrect in relying on a district policy. Specifically, they referenced the case of Churchill vs. SAD #49 Teachers Association, a Maine state Supreme Court case dated November 18, 1977, which concluded "that school boards may exercise only those powers conferred on them by the State's education laws."

This case, although decided decades ago, has retained its status as controlling law in the State of Maine. It is widely recognized in the public education community in Maine and is featured prominently, along with a summary of it's holding, in the Maine School Boards Association ("MSBA") Handbook (2011 edition, which is the last edition published) (text referring to Churchill is on page 12-16, footnote of the citation is on page 12-19), which is

prepared and published by the Maine School Management Association.

55.   Furthermore, the plaintiffs thoroughly examined Maine's education laws and found no statute in Maine that mandates parents to obtain documentation from a doctor regarding a student's absence from school. Nor does any statute in Maine authorize school boards to request or require documentation from a doctor when a child is absent from public school. Given the absence of a Maine statute mandating or authorizing such documentation, the school board policy on which the defendants relied is immaterial and void.

56.   Despite the presentation of this argument to the defendants, and the widely available information on the limits of school boards' authority in the educational system, the defendants neither responded to the plaintiffs' argument nor altered their approach to documenting EC's absences.

**Transportation of EC to and from CRCS**

57.   In October 2022, Klos and CRCS exchanged emails concerning the transportation of EC to and from school. Guzman was no longer residing with EC and was unavailable to provide transportation. Klos informed CRCS that his disability precluded him from offering transportation to and from CRCS. Klos submitted a proposed transportation plan for EC, which involved EC being picked up and dropped off at her residence, with a schedule that incorporated the "late start" accommodation.

58.   In an email to Works dated October 7th, 2022, Klos stated: "As I stated in my last email and which you have omitted from your reply, I am unable to get [EC] to the bus stop in Solon. Additionally, [EC] has something we called a "late start" accommodation which was made part of the mediation agreement that *you* helped create and *you* agreed to. Why would you now pretend like those are not factors in this equation? The only interpretation that I can come up with is that you're looking for an excuse to deny your responsibilities. Telling me that the bus gets there earlier is completely irrelevant since [EC]'s "late start" accommodations cause her to be transported to school considerably later than the regular school bus. I'm going to interpret your complete dismissal of [EC]'s late start accommodation as your intention to ignore and refuse to honor that

part of the mediation agreement." Further in the email, Klos stated: "Picking up and dropping off [EC] at her home is mandatory and is not negotiable. That is the only way she's going to get to and from school in light of all of the circumstances, including those circumstances you have conspicuously omitted from your email."

59.    In response, Works ignored Klos' transportation proposal but suggested that EC could take the school bus from the Solon Superette bus stop. This bus stop was located 8 miles from EC's home in the parking lot of the Solon Superette, which was a closed defunct sandwich shop with a large parking area. There was no transportation available between EC's home and the Solon Superette, and no adult supervision provided between these two locations. The school bus typically departed from this bus stop between 7 and 8 AM each morning and returned to the Solon Superette at approximately 4:45 PM after school. Works proposed that EC be left unattended without adult supervision at this location each day after school, with no means to get home.

60.    Considering that EC was a moderately autistic 12-year-old at the time, and taking into account her specific limitations, capabilities, and condition, the act of leaving her in the parking lot of a closed establishment would unequivocally meet the criteria defined as the crime of "Abandonment Of A Child," in Title 17-A of the Maine Criminal Code, Chapter 23, § 553. EC has never experienced a lack of adult supervision, and the act of leaving her alone in such a situation would cause her extreme distress, confusion, and anxiety. EC was not equipped to walk the 8-mile distance to her home, even if she were familiar with the route or direction. Moreover, she lacked the skills to perceive or recognize potential danger or ill intent in unfamiliar individuals. Essentially, EC was entirely reliant on adult support, especially when she was away from her home.

61.    Works' suggestion that EC should 'take the bus' disregarded the "late start" accommodation that was included in the Mediation Agreement he had signed approximately 19 months earlier. This was evident because the bus's morning schedule was considerably earlier than what the late start would have provided for. In fact, EC had never taken the morning bus to school on any occasion simply because it was too early to make such an attempt. Works' offer

for EC to be picked up and returned to the Solon Superette by the school's bus without a plan for her safe transportation to and from home demonstrated a lack of concern for EC's safety and well-being. It also sent a clear message that Works was unwilling to consider or address EC's transportation problem in good faith, as he was essentially ignoring the 'late start' accommodation and suggesting a situation that could have amounted to criminal abandonment, leaving EC completely alone 8 miles from her home.

62.  Klos, realizing that Works was not treating his transportation request seriously, took the initiative to obtain a letter from his neurologist and promptly provided a copy to Works. This letter succinctly outlined Klos' disability and provided further support for Klos' claim that he was incapable of providing transportation for EC away from their home.

63.  Following the receipt of Klos' neurologist's letter, Works responded by proposing an alternative transportation plan. In this new plan, CRCS would arrange for EC to be picked up from her home at approximately 8 AM each school morning, and then place her on a school bus in the afternoon, which would drop her off at the Solon Superette. Similar to his initial plan, this alternative arrangement left EC with no means of returning home from the Solon Superette, and she would be left at the bus stop without any adult supervision or a way to get back home. Defendants later referred to this transportation plan as "door-to-door," although they did not specify that the "door" EC would be delivered to in the afternoon was technically the parking lot of the Solon Superette, 8 miles from EC's home. Picking up EC at about 8 AM each school day was in direct conflict with the 'late start' accommodation, and proposing to do so was another clear communication that CRCS, through Works, was unwilling to honor the 'late start' accommodation that he had agreed to in the Mediation Agreement.

This transportation plan proposed by Works was also in contradiction to the school district policy, which clearly stated that: "for the safety of the learners, children will be released only to parents, guardians, and individuals listed on the emergency forms." The policy emphasized the importance of notifying the office in cases of restraining orders or custody limitations and making prior

arrangements if someone other than the parent or guardian was to pick up the child after school. Works' transportation plan which included leaving EC in a parking lot 8 miles from her home obviously clashed with this established and published CRCS policy.

64.    In an email dated November 3rd, 2022, Works indicated: "We will have a staff member or employee arrive at your house ([address]) at approximately 8:00 am [Monday, November 7th, 2022] to transport [EC] to Dimensions Academy. The driver will only be able to wait a couple of minutes, so it is important, like any stops, that [EC] is ready at that time. [EC] will take the bus home in the afternoon and will be dropped off at the Solon Superette, our furthest stop." Works' claim that the driver could only wait a "couple of minutes" was a direct response to my previous email, which indicated that EC might need time (each morning for a few days or more) to get used to a new schedule, and asked that the driver be understanding and able to accommodate EC's adjustment to the new routine. Furthermore, Works compared the process of picking up EC from her home to the operation of buses that travel designated routes to pick up multiple children. It's important to note that a bus following a set route to collect multiple students may have time constraints to maintain its schedule. However, in the case of a driver picking up only one student, EC, there wouldn't be the same time constraints as with a bus carrying multiple students along a fixed route.

65.    In this same November 3rd, 2022 email, Works wrote: "Regarding [EC]'s late start, I recall quite well the consideration of this issue in our mediation, and the context of the agreement. As background, the school day typically begins at 7:45am with breakfast and academics starting at 8:10am. As a general rule, it is expected that all learners will attend school during regular school hours. In previous conversations about your request that [EC] be granted a "late start," CRCS informed you that it required evidence that this was necessary as an accommodation of an identified disability. In 2019 and 2020, the IEP Team had no such evidence. During the mediation, and in the context of remote learning, we agreed to a compromise in which 1) the school and the parents will develop a plan to allow late start for the child within the policies of the school building;

and 2) the school shall arrange for a Functional Behavioral Analysis to evaluate the student's issues with morning starts to the school day and the results will be shared and discussed with the parents to develop a plan for the student."  It was understood that the purpose of the FBA would be identify whether a need for a late start could be documented, and whether any accommodations or supports might be appropriate to address Eponine's "issues with morning starts," with the goal of supporting her in being able to participate fully in school, on the regular school schedule."

66.    On the morning of Monday, November 7th, 2022, Works and another unidentified individual arrived at Klos' residence at 8 am to pick up EC. However, due to their early arrival, EC was not prepared to leave, and Klos was unable to get to the front door. Works took advantage of this situation and went to Klos' neighbors' houses to inquire about Klos and EC. During this visit, Works also noticed documents attached to Klos and EC's front door and proceeded to take photographs of Klos' door and the documents. According to his own account, Works spent several minutes at Klos' house before departing without EC.

67.    Incidentally, the documents that Works noticed on Klos' door were the documents CRCS had erroneously sent to and served on plaintiffs. The envelope intended for Klos was sent with his name on it to Guzman's address, and the envelope intended for Guzman was sent with her name on it to Klos' address. Neither plaintiff wanted to accept the incorrectly addressed documents to avoid worsening an already tense relationship with defendants. Moreover, at the time they were sent by CRCS, Klos and Guzman were not communicating with each other.

68.    The following morning, on Tuesday, November 8th, 2022, Works and another unidentified individual once again arrived at Klos' residence with the intention of picking up EC for school. As was the case the previous day, EC was not prepared for school, and Klos was unable to reach the door while Works was present. After a period of waiting, Works eventually departed from Klos' residence without EC.

69. On Wednesday, November 9th, 2022, Klos sent a text message to Works, informing him that EC would not be available to be transported to school. Klos had no arrangements or way to get EC's from the Solon Superette in the afternoon, and the last communication from Works and the district indicated their intention to abandon EC at the Solon Superette after school. While Klos initially informed Works that EC would not be available for pickup on that specific day as he researched the situation further, Works replied to Klos' text message as though Klos had decided not to make EC available for school transportation ever again, and discontinued all efforts to provide EC with the previously discussed 'door-to-door' transportation.

70. CRCS has made no attempt to provide EC with any transportation, which has the direct consequence and is the only reason EC has been unable to attend school since then.

71. As CRCS had done previously, Savage has marked EC as absent each day, and CRCS ignored Klos' assertion that EC's absence was solely because CRCS refused to provide transportation for EC to and from school. Savage has documented EC's absences as unexcused, declared EC to be "truant", and has sent Klos monthly Attendance Audits showing EC had missed every day of school during the school year.

72. EC has missed every day of school for over two full school years and has not been tested by defendants in over two years. Despite this significant gap in assessment and education, defendants have deemed it appropriate to advance EC to eighth grade without any supporting evidence that eighth grade is an appropriate educational level for EC.

**Plaintiffs' emails with defendant Makin, the Commissioner for the Maine Department of Education**

73. On November 8th, 2021, February 3rd, 2022, March 24th, 2022, September 8th, 2022, September 13th, 2022, September 23rd, 2022, October 5th, 2022, October 7th, 2022, October 11th, 2022, October 31st, 2022, and November 15th, plaintiffs emailed Makin, seeking her assistance and intervention in the situation regarding EC's education.

74.   Plaintiffs provided detailed explanations of the issues and impasses that were hindering EC from receiving the Free Appropriate Public Education and special education services she is legally entitled to. Makin received these emails, as plaintiffs received autoresponders confirming their delivery, but Makin never once responded or took action to address plaintiffs' concerns. Makin's evident awareness of plaintiffs' ongoing struggles and her complete inaction in response to them could be considered 'deliberate indifference' as defined in Monell v. Department of Social Services, 436 U.S. 658 (1978).

**Plaintiffs' Complaint filed with Maine Human Rights Commission**

75.   In February 2023, Klos filed a complaint against CRCS and Works with the Maine Human Rights Commission ("MHRC"). This complaint alleged that CRCS and Works were engaging in discriminatory behavior by:

[A]   Refusing to honor an existing accommodation, specifically the 'late start' accommodation that had been considered in effect since March 31, 2021.

[B]   Refusing to provide EC with transportation to and from school after learning that Klos was disabled and unable to provide transportation for EC.

MHRC accepted this complaint and designated it as "ED/PA23-0146 Klos v. Community Regional Charter Schools."

76.   In June 2023, Wurgaft and Bessey responded to plaintiffs' complaint filed with MHRC. However, defendants' response was riddled with misrepresentations of key facts in the matter and included numerous falsehoods. Their distortion of the narrative went beyond what could be considered as argument, with the clear intention of convincing the reader that plaintiffs' complaint lacked any merit. Here are some examples of their distortions:

[A]   They claimed that EC had ridden the bus to school when, in fact, she had never once used the bus for transportation to school. EC was consistently brought to school by her mother.

[B]   Defendants asserted that CRCS offered "door-to-door

transportation" for EC, implying that EC would be picked up at her home and transported to school each morning, with the same service provided after school but in reverse. However, the reality was quite different, and the use of the term "door-to-door" to describe the transportation CRCS was offering EC was undeniably deceptive. CRCS had communicated in multiple emails that they would place EC on a school bus each afternoon and then leave her at the Solon Superette, the final stop of the bus route, with no means of getting the remaining 8 miles to her home. This misrepresentation of the transportation service provided to EC was clearly intended to mislead.

[C]    Defendants attempted to re-argue the merits of the 'late start' accommodation with MHRC, ignoring the fact that CRCS was legally obligated to honor it since the signing of the Mediation Agreement on March 31, 2021.

[D]    Defendants falsely claimed that plaintiffs were seeking MHRC's enforcement of the Mediation Agreement, even though no such claim was made in plaintiffs' complaint, and no reasonable inference could support this assertion.

[E]    Defendants dedicated considerable effort to bringing up EC's absences, seemingly as a diversionary tactic to distract from the core issues raised in the complaint.

[F]    Defendants presented examples of plaintiffs' emails expressing frustration, seemingly to paint plaintiffs as unreasonable.

[G]    Defendants submitted copies of emails but redacted any mention of plaintiffs' disabilities and struggles, even though these redacted terms were directly relevant to the discrimination complaint.

[H]    Defendants distorted many other well-documented narratives, all with the clear intent of influencing the dismissal of the complaint. These distortions went beyond reasonable argument or interpretation and were evidently calculated acts intended to

deceive.

77. Defendants Wurgaft and Bessey have exerted considerable effort in attempting to have plaintiffs' complaints, and therefore their rights, denied by the MHRC through the use of fraud and deception, mirroring the actions in response to the discrimination complaint plaintiffs filed with the US Department of Education, Office of Civil Rights in May 2021.

78. Interestingly, defendants admitted to and made several claims in their written response to MHRC regarding plaintiffs' complaint, which reflect their inappropriate actions as described in this complaint. These quotes are from the first page of defendants' filing with the MHRC and are also relevant here:

"As part of the special education process and beginning as far back as the 2018 -2019 school year, CRCS has had numerous dialogues with EC's parents about the Parents' request that EC be provided with a late start to the school day. 2 The IEP Team first discussed the potential of modifying EC's school day during an IEP Team Meeting in January of 2019, after Complainant and EC's mother (collectively the "Parents") raised concerns regarding the distance EC traveled to school and her "difficulty getting going in the morning."3 At the January 2019 meeting, Parents explained that EC struggled to get up in the morning and get ready for school, so they allowed her to take "time and space" to emotionally prepare for the school day. The IEP Team noted that EC did not have a history of requiring special education transportation and was not otherwise demonstrating a disability-related need preventing her from attending the regular school day. Additionally, the Team noted that despite EC's frequent tardiness, she was not missing instructional time or special education services, and when she did arrive at school on time, she performed well and she did not demonstrate any learning or behavioral issues as a result of the regular start time. Because there was no disability-related need for a late start, the Team determined it was not appropriate to modify EC's school day. The Team encouraged the Parents to establish a regular sleep schedule and morning routine for EC, and concluded they could revisit the topic in the future if necessary. The IEP Team next discussed modifying EC's school day at an IEP Team Meeting in June of 2019, again determining they did not have any

disability-related evidence to demonstrate EC needed a late start."

79.    From this run-on paragraph copied verbatim from defendants' filing with the
MHRC, several things are evident:

[A]    Defendants Wurgaft and Bessey (the authors of this document)
acknowledge that plaintiffs persisted for an inordinate amount of time for
defendants to accept and honor the "late start" accommodation that they
requested, and essentially admit that defendants never agreed to it.

[B]    Defendants make reference to and acknowledge the level of detail
plaintiffs provided defendants regarding EC's sleep difficulties, and that
defendants used this information to fabricate arguments against
approving the request, arguments which were not authorized by the ADA.

[C]    Defendants articulate one of the many strategies plaintiffs had been
doing on the advice of EC's doctors and healthcare professionals: "they
allowed her to take "time and space" to emotionally prepare for the
school day". Although this wasn't the entirety of the information provided
and the circumstances plaintiffs had with EC each morning,
acknowledging this mental health treatment strategy alone justifies the
"late start" accommodation.

[D]    Defendants stated: "... despite EC's frequent tardiness, she was not
missing instructional time or special education services" by arriving to
school as late as 9:30 AM each morning. Defendants freely admit that
allowing the "late start" accommodation was not intrusive in EC's school
day, and it's impact on EC's education was nominal at best.

[E]    Defendants admit considering "... EC did not have a history of requiring
special education transportation", which isn't a valid consideration
regarding the "late start" accommodation request because EC was in a
new school environment with new transportation requirements, and EC
had been emotionally abused in her previous school setting. EC was new
to this recovery phase, and plaintiffs were seeking help and doing all they
knew how to do to support EC at her new school.

[F]    Defendants admitted that plaintiffs' morning routine with EC was working: "... and was not otherwise demonstrating a disability-related need preventing her from attending the regular school day." If plaintiffs didn't emotionally prepare EC for school each day, EC would have been much more likely to have meltdowns, emotional outbursts, and considerably less successful as a student overall.

[G]    Defendants admit to providing unsolicited medical advice: "The Team encouraged the Parents to establish a regular sleep schedule and morning routine for EC" - even after being informed that plaintiffs were working with and following the advice of EC's doctors, mental health professionals and other professionals who EC was receiving services from or being treated by for her sleep-related problems.

[H]    Defendants admit they never offered any finality in their responses regarding the "late start" accommodation plaintiffs requested: "... and concluded they could revisit the topic in the future".

## EC's Educational Records

80.    Over the months when EC was home from school, there were three different reasons for her absences:

A.    There were periods of time EC was kept home with the reason being "personal health, including the person's physical, mental, and behavioral health."

B.    There were six days total when EC was kept home with the reason being "observance of a recognized religious holiday when the observance is required during the regular school day."

C.    There were many days when EC remained home during school days due to CRCS's refusal to provide safe and appropriate transportation for EC between her home and Dimensions Academy and Overman Academy. This includes every single school day from October 11, 2022, through the day this civil action was filed.

81.    The absences referred to in A and B are excused absences pursuant to

Maine Title 20-A section 3272(3)(A & B). The absences referred to in C were solely due to defendants' refusal to provide EC with safe, appropriate transportation to the CRCS schools, despite being informed of Klos' disabilities and inability to provide EC with transportation. Defendants offered transportation too early for the 'late start' accommodation and only provided an option to leave EC 8 miles from her home with no way to get home at the end of each school day.

82. Plaintiffs believe that none of these days should be recorded in EC's educational record as her being truant, but this is how EC's absences are being treated and recorded by defendants. As such, plaintiffs have requested a hearing pursuant to FERPA.

83. Upon Klos' first request, Works responded with prospective dates for the FERPA hearing, but Klos went through a period of time where he could only focus on his medical problems and did not respond to Works. Klos made a second FERPA hearing request, and Works again responded with possible dates for the hearing. Klos did indicate to Works that the dates for a FERPA hearing would have to be towards the third week of August 2023 and thereafter, but Klos has not heard from Works again regarding this request.

84. During these email exchanges, Works indicated the individuals who would have been present at the hearing, but when asked, did not respond to who specifically would be holding the hearing. Works stated: "As for who will be present depends on the dates and times with schedules. I am planning on being present but it could also include any of the following: Ashlee Savage, Susan Muzzy, Tammy Wyman, Elizabeth Firnkes, and/or Brian Andre, all of which are part of our administrative team."

85. From previous experience, Klos interprets this response to mean that Works will likely hold the FERPA hearing, as he makes a point to oversee every interaction and aspect of plaintiffs' involvement with CRCS. Even if Works isn't the one who holds the hearing, there would still be a conflict of interest. Every person listed by Works has either directly or indirectly participated in designating EC's absences as "unexcused," despite plaintiffs' arguments that EC's

absences are legally excused. As Works is also responsible for EC's attendance records showing EC as truant - the exact records plaintiffs were pursuing a FERPA hearing to correct, it is obvious that the matter would not get serious consideration. Even if Works didn't hold the FERPA hearing, every person he listed is involved in EC's absences in some way and could not be impartial.

**The Mediation Agreement**

**Mediation Agreement, Paragraph 1**

86.   On the day of the Mediation Meeting, the plaintiffs understood the "late start" request to be an accommodation request under the ADA, even though CRCS had not treated it as such. The plaintiffs' understanding in the context of Works and CRCS was that the only actual change that needed to be made with regards to defendants agreeing to the 'late start' accommodation request was for CRCS to modify EC's past record and the time at which EC was considered late going forward. Once CRCS agreed to the "late start" in the Mediation Agreement, the plaintiffs saw no further action for them to take, and CRCS did not request any additional action from the plaintiffs. However, despite agreeing to the "late start" in paragraph 1 of the Agreement, CRCS has consistently maintained their position and refused to honor the "late start" accommodation request.

**Mediation Agreement, Paragraph 2**

87.   The FBA was never a prerequisite for the 'late start' accommodation but was merely suggested as a means to gain further insight into the necessity for it. Since there is no language in the Mediation Agreement that ties the FBA to the 'late start' accommodation, these two elements should be regarded as entirely separate and independent of each other. If the FBA were intended to be connected to the 'Late Start' accommodation, such a linkage would have been explicitly mentioned in paragraph 2, similar to how paragraph 4 references the content of paragraph 3.

88.   Since the initial mention of the FBA by defendants up to the present day, they have failed to specify what would be evaluated and the methodology that would be employed. Consequently, they have not fulfilled the requirements outlined in

paragraph 2 of the Mediation Agreement.

89. Since agreeing to the Mediation Agreement, defendants have attempted to use the guise of an FBA to intrude into plaintiffs' personal lives and medical conditions, all without specifying the scope, target, and parameters of the assessment they are proposing to conduct. Defendants' failure to pursue a valid, appropriately scoped, and directed FBA to objectively assess EC's arrival at school each morning constitutes a breach of the Mediation Agreement, paragraph 2.

**Mediation Agreement, Paragraph 3**

90. Plaintiffs are not raising an issue regarding Mediation Agreement paragraph 3 at this time.

**Mediation Agreement, Paragraph 4**

91. Plaintiffs are not raising an issue regarding Mediation Agreement paragraph 3 at this time.

**Mediation Agreement, Paragraph 5**

92. Despite this being a well-established tenet of the IDEA, CRCS routinely acts unilaterally, determining the agenda of IEP Meetings and often ignoring or dismissing matters raised by EC's parents for discussion. The presence of this paragraph in the Mediation Agreement itself indicates that the issue of CRCS ignoring and disregarding plaintiffs' agenda requests and input was both prevalent and known to defendants prior to the Mediation Meeting. While agreeing to something that is already set forth by statute may seem redundant, it did provide plaintiffs with a more direct remedy to address these types of concerns, specifically through this civil action.

93. One example of a request by plaintiffs that was routinely rejected by defendants was to add to an IEP Meeting agenda the discussion of the food choices available to EC for lunch and snacks. As a symptom of her autism, EC is known as a picky eater, and her parents noticed that EC was not getting guidance on what to eat at school and was making unhealthy food choices when left to her own devices. Plaintiffs wanted to discuss this and

explore what could be done, but defendants never allowed it on the agenda for an IEP Meeting.

94.    The meeting that defendants held on September 30, 2021, falsely labeled as an "IEP Meeting," represents the initial instance in which defendants breached Mediation Agreement paragraph 5.

95.    The "IEP Annual Review" that defendants conducted on November 26, 2021, was organized by and the agenda was set exclusively by defendants. Earlier in November 2021, during the planning of this meeting, defendants did not involve plaintiffs in the preparation or agenda-setting process. They also rejected the issues plaintiffs requested to be included in the meeting's agenda. This complete omission of plaintiffs from the meeting's preparation constituted a breach of paragraph 5 of the Mediation Agreement.

96.    At each IEP Annual Review conducted by defendants (including the one mentioned in the previous paragraph), defendants have insisted that the educational services and accommodations offered and provided to EC must align and remain consistent with the disability category under which EC is deemed eligible, specifically 34 CFR § 300.8(c)(1)(i) [Autism]. Consequently, defendants have disregarded and failed to properly consider special education services and accommodations that might be more appropriate for EC, regardless of their alignment with her eligibility category.

97.    While EC may be autistic, her most significant challenges at school stem from severe deficits in attention and motivation, which make it exceedingly difficult for her to function in a classroom with typical peers. Although EC is considered eligible for special education due to her autism, the services and accommodations provided should be tailored to address her individual difficulties, rather than solely adhering to the disability category associated with her eligibility. However, defendants have consistently sought to match EC's services and accommodations to her eligibility category of autism, a stance that plaintiffs disagree with and believe to be erroneous.

98.    Instead, plaintiffs firmly believe that a child eligible for special education services under the IDEA should receive services and accommodations that

best address their specific limitations and challenges, irrespective of the disability category.

99. The IEP Meeting for EC that defendants may have conducted on September 13, 2022, if it indeed occurred, transpired without providing notice to the plaintiffs, excluding them from the planning and agenda-setting process, and transpired in their absence. The sole indication that plaintiffs received regarding the purported IEP Meeting on September 13, 2022, was a Google calendar notification. If this meeting indeed took place, the circumstances surrounding it would have been in violation of the Mediation Agreement, specifically paragraph 5.

100. Defendants scheduled a meeting without plaintiffs' input when they rescheduled the "IEP Triannual Review." They once again refused to involve plaintiffs in the planning and agenda of this meeting and expressed their intention to include two additional school administrators as guests.

101. Defendants asserted that they required permission to conduct an evaluation of EC. However, the consent form they provided also allowed for the disclosure of personal, privileged information, which typically goes beyond what school districts require for their responsibilities. Defendants interpreted Klos' refusal to provide permission under these circumstances as a refusal to authorize an evaluation of EC. Klos was willing to authorize an evaluation of EC but would not consent to the unnecessary disclosure of personal and privileged information to defendants. Plaintiffs believe that defendants sought this additional personal and privileged information to potentially question the decisions of plaintiffs, EC's doctors, healthcare providers, or others who work with EC outside of the school environment, just as they had previously done when discussion EC's sleep difficulties in the context of the 'late start' accommodation request.

102. Plaintiffs also objected to the addition of extra, unnecessary, and unauthorized individuals being invited to this meeting, but defendants disregarded this objection, have previously asserted that they had the right to invite whomever they pleased to any "IEP Meeting."

103. When Klos was unable to attend the initially scheduled date, defendants rescheduled the meeting and sent notice to Klos at an address he had never maintained.

It is important to note that Klos and EC's home/street address has remained unchanged throughout EC's attendance at CRCS and was accurately recorded on all documents when EC was first enrolled with CRCS. It remains unclear why or when CRCS changed the mailing address they had on file for Klos and EC.

104. Defendants conducted this "IEP Triannual Review" without plaintiffs present and used the unavailability of a current evaluation of EC as their excuse to revoke EC's eligibility for special education services under the IDEA.

105. The information they placed on the "adverse action" form, which they used to justify their revocation of EC's special education services, was incorrect, out-of-context, or otherwise inappropriate. Questions asking for "yes" or "no" or "n/a" responses were summarily answered "no" when the actual answer should have been "there isn't enough information to responsively answer this question." Other questions were answered without context or explanation, implying a meaning that is inconsistent with the truth or reality. Similar to what they did at the September 30, 2021 meeting, defendants completed this form with information they believed would support the outcome they desired – in this case, the revocation of EC's special education eligibility.

106. None of EC's disorders, including autism, ADHD, and anxiety, are curable, and autism is especially known for being a lifelong condition. Works, (who himself has an autistic teenage son,) is well aware of this fact. It is inconceivable that any of the defendants at the December 6th, 2022 "IEP Triannual Meeting" could have believed that EC had been miraculously cured of her disorders.

107 Throughout the process, defendants had multiple opportunities to initiate a due process hearing request against plaintiffs if they believed plaintiffs were being unreasonable regarding evaluations or other aspects of the IEP process. Defendants could have also sought enforcement of the Mediation Agreement if they felt plaintiffs were not fulfilling their part of the agreement. At each stage,

defendants had the ongoing opportunity to consider and respond appropriately and responsively to plaintiffs' concerns, including the many instances where plaintiffs challenged defendants for failing to adhere to the Mediation Agreement. However, defendants' consistent failure to take any of these actions demonstrates that they were never acting in good faith, particularly on December 6th, 2022, when they abruptly revoked EC's special education eligibility. Given what defendants knew about EC, it can never be said that their actions on December 6th, 2022 were in the best interests of EC.

108.    Defendants' actions to obstruct plaintiffs' inclusion in the agenda of the "IEP Triannual Review" held on December 6, 2022, violated the Mediation Agreement, paragraph 5.

**Mediation Agreement, Paragraph 6**

109.    Plaintiffs are not raising an issue regarding Mediation Agreement paragraph 6 at this time.

**Mediation Agreement, Paragraph 7**

110.    Defendants' refusal to reschedule the "IEP Annual Review" held by defendants on November 26, 2021, constitutes a breach of the Mediation Agreement, paragraph 7.

111.    Defendants' refusal to provide adequate notice regarding the rescheduling of the "IEP Triannual Review" held by defendants on December 6, 2022, constitutes a breach of the Mediation Agreement, paragraph 7.

112.    All actions taken by defendants at meetings held without plaintiffs present should be declared null and void.

**Mediation Agreement, Paragraph 8**

113.    Defendants' choice to include "Special Education Director" Walters at the meeting they conducted on September 30, 2021, constitutes a breach of the Mediation Agreement, paragraph 8.

114.    Defendants' choice to include "Special Education Director" Walters at the "IEP Annual Review" they conducted on November 26, 2021, constitutes a breach of the Mediation Agreement, paragraph 8.

115.   Defendants' choice to include "Special Education Director" Walters at the "IEP Triannual Review" they conducted on December 6, 2022, constitutes a breach of the Mediation Agreement, paragraph 8.

**Mediation Agreement, Paragraph 9**

116.   With the signing and filing of the Mediation Agreement, the Hearing request initiated against defendants by plaintiffs was dismissed.

**Defendants' Awareness of Plaintiffs' Anxiety and Alleged Intention to Aggravate It**

117.   Throughout the events described in this complaint, it was evident to defendants that plaintiffs were coping with extreme anxiety. As early as our initial meetings with defendants in 2018, we openly shared our struggles with anxiety and generalized anxiety disorder.

118.   Since our initial request for a special education hearing in March 2021, we believe that many of defendants' actions were intentionally aimed at exacerbating our anxiety. This becomes particularly clear when we examine specific instances:

[A]    Email Exchanges Regarding EC's Truancy:

Defendants' determination that EC's absences were unexcused

[B]    Email Exchanges Concerning Safe Transportation for EC:

Our requests for appropriate and safe transportation for EC

[C]    Discrimination Complaints Filed with the US Department of Education, Office of Civil Rights:

Defendants' responses, which we perceive as fraudulent

[D]    Discrimination Complaint Submitted to MHRC:

Defendants' response to our complaint, which we again view as fraudulent

[E]    Violation of the terms Mediation Agreement:

Defendants' explicit refusal to respect and honor the terms of the

Mediation Agreement

119.   This intent to cause us undue anxiety is further evident in defendants' response
to the MHRC regarding our complaint. In their response, they chose to
emphasize our frustration and emotional reactions, seemingly as a way to divert
attention from their own actions.

## Causes Of Action

### First Cause of Action: Violation of the Individuals with Disabilities Education Act (IDEA)

In September 2017, child psychiatrist Dr. Erik Kuntz diagnosed Plaintiff EC with a sleep
difficulty issue. EC had an Individualized Education Program (IEP) in place pursuant to
the Individuals with Disabilities Education Act (IDEA) from her previous school, which
was transferred to Dimensions Academy when she enrolled as a third-grader at CRCS.

Throughout EC's enrollment at CRCS, the district and EC's parents convened several
IEP Meetings to discuss and review EC's progress and special education
programming. Defendants were aware of EC's documented sleep difficulties and her
existing IEP.

Despite their knowledge of EC's sleep-related difficulties, Defendants failed to properly
address or accommodate these difficulties during IEP Meetings, thereby violating the
IDEA.

Plaintiffs respectfully request that this Court find in their favor and provide the
requested relief to rectify Defendants' violations of the IDEA.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment stating that Defendants violated the IDEA;

b. An injunction ordering Defendants to provide appropriate accommodations for EC's
sleep-related difficulties;

c. Compensatory damages for any harm suffered by Plaintiffs as a result of

Defendants' actions;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

## Second Cause of Action: Failure to Provide a Reasonable Accommodation under Section 504 of the Rehabilitation Act

Despite Plaintiffs' repeated requests, Defendants failed to formally grant or consider the requested "late start" accommodation under Section 504 of the Rehabilitation Act, which resulted in discrimination against EC.

### Relief Sought:

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment stating that Defendants violated Section 504 of the Rehabilitation Act;

b. An injunction ordering Defendants to provide the requested "late start" accommodation;

c. Compensatory damages for any harm suffered by Plaintiffs as a result of Defendants' actions;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

## Third Cause of Action: Violation of the Americans with Disabilities Act (ADA)

Plaintiffs requested a "late start" accommodation for EC due to her sleep-related difficulties. Despite having a thorough understanding of EC's sleep-related difficulties, CRCS never permitted it to become a substantial topic of discussion during an IEP Meeting.

Defendants persisted in denying the "late start" accommodation while providing unsolicited medical advice on how to handle EC's sleep-related issues. This

constituted a violation of the Americans with Disabilities Act (ADA).

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment stating that Defendants violated the ADA;

b. An injunction ordering Defendants to provide the requested "late start" accommodation;

c. Compensatory damages for any harm suffered by Plaintiffs as a result of Defendants' actions;

d. Punitive damages, as appropriate, due to Defendants' willful and malicious conduct;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

**Fourth Cause of Action: Negligence**

EC had documented sleep difficulties, and Plaintiffs requested a "late start" accommodation to address these difficulties. Defendants never formally granted or denied the accommodation from the time of the initial request in the Fall of 2018 until March 31st, 2021.

Defendants owed a duty of care to EC to address her documented sleep-related difficulties. However, they breached that duty by failing to properly address and accommodate these difficulties, causing harm to EC.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment stating that Defendants were negligent in addressing EC's sleep-related difficulties;

b. Damages for any harm suffered by Plaintiffs as a result of Defendants' negligence;

c. Attorney's fees and costs;

d. Any further relief that this Court deems just and equitable.

**Fifth Cause of Action: Violation of the Americans with Disabilities Act (ADA) - Failure to Provide Reasonable Accommodation and Retaliation**

On February 25, 2021, plaintiffs made a formal request for reasonable accommodations under the Americans with Disabilities Act (ADA) to defendants Muzzy, Works, and CRCS. Plaintiffs sought these accommodations to ensure equal access to education and related benefits and services.

Defendants ignored Plaintiffs' ADA accommodation request, failing to engage in the interactive process or provide reasonable accommodations as required by the ADA.

In May, 2021, plaintiffs, in response to defendants' failure to provide accommodations, filed a formal complaint with the Department of Education Office of Civil Rights (OCR). This complaint was filed pursuant to the ADA and its implementing regulations, seeking redress for the ADA violations by Defendants.

During OCR's investigation into the complaint, OCR contacted defendants CRCS to gather information and evidence. Defendants and their legal representatives, knowingly and willfully made false statements and claims to OCR with the intent to deceive and induce OCR to dismiss the complaint.

As a result of Defendants' false statements and claims, OCR dismissed plaintiffs' complaint in October 2021, erroneously concluding that the ADA violations alleged by Plaintiffs lacked merit.

Defendants' failure to provide reasonable accommodations and their retaliatory actions, including making false statements to OCR, constitute violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment stating that Defendants violated the ADA;

b. An injunction ordering Defendants to provide the requested reasonable accommodations;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' actions;

d. Punitive damages, as appropriate, due to Defendants' willful and malicious conduct;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

**Sixth Cause of Action: Violation of the Individuals with Disabilities Education Act (IDEA) - Misrepresentation of Meeting Type**

In September 2021, Defendants sent out a notice falsely identifying a meeting as an "IEP Meeting" pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq.

Defendants intentionally and falsely represented the nature of the meeting as an "IEP Meeting," thereby misleading Plaintiffs regarding the purpose and scope of the meeting and failing to provide adequate notice.

Plaintiffs' requests to include specific agenda items in the meeting were summarily rejected by Defendants.

Defendants failed to respond truthfully to Plaintiffs' inquiries about the true purpose of the meeting, causing Plaintiffs to be unaware of the actual nature of the meeting.

The meeting held on September 30, 2021, was not conducted as an "IEP Meeting" but rather as an interrogation of Plaintiffs regarding medical details concerning EC's absences from school.

Defendants' actions in making determinations regarding EC's absences without evidence or deliberately in the school district's best interests are contradictory to the precepts of the IDEA, which require the IEP Team to act only in the best interests of the child.

Subsequent to this meeting, Defendants used their false determination made at this meeting to deny EC special education services during her excused absences, causing harm to EC and her parents.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of the IDEA, including misrepresenting the meeting type and failing to act in the best interests of the child.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of the IDEA;

b. An injunction ordering Defendants to provide EC with the appropriate special education services and support;

c. Compensatory damages for the harm suffered by Plaintiffs and EC as a result of Defendants' actions;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Seventh Cause of Action: Violation of Privacy Rights - Interrogation Regarding Medical Information**

In the course of the meeting held on September 30, 2021, Defendants interrogated Plaintiffs about EC's medical details for keeping her home from school.

Defendants' interrogation of Plaintiffs regarding EC's medical information constitutes an unauthorized intrusion into Plaintiffs' privacy rights.

Plaintiffs invoked the privilege concerning EC's medical information, as provided by Maine statute Title 20-A, section 3272(3)(A), "Personal health, including the person's physical, mental, and behavioral health." Defendants disregarded this privilege.

Defendants' actions in interrogating Plaintiffs regarding EC's medical information caused harm to Plaintiffs by violating their privacy rights, and by using plaintiffs' refusal

to answer as justification to 'determine' EC was not absent from school for reasons related to her disabilities.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violation of their privacy rights during the meeting on September 30, 2021.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of Plaintiffs' privacy rights;

b. An injunction preventing Defendants from making determinations of material fact in the absence of information, or drawing inferences from claims or assertions of privilege.

b. An injunction preventing defendants from asking students or their families for privileged information when they have expressed an objection to doing so

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' unauthorized interrogation;

d. Any further relief that this Court deems just and equitable.

**Eighth Cause of Action: Violation of the Individuals with Disabilities Education Act (IDEA) - Improper Composition of IEP Meetings**

Defendants have frequently invited individuals to EC's IEP Meetings who do not meet the statutory requirements of 34 CFR § 300.321(a). This practice is not in the "best interests of the child" as required by IDEA, and it serves only to 'stack' the IEP team with individuals whose loyalty lies solely with the school district for the purposes of any voting done at the meeting. One such example (of many) is the meeting defendants held on September 30, 2021.

Plaintiffs assert that the frequent inclusion of individuals who do not meet the statutory requirements for IEP team members constitutes a violation of IDEA, specifically 34 CFR § 300.321(a), which outlines the composition of the IEP team.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment stating that individuals invited to an IEP Meeting over the objection of the parents or guardians must satisfy all criteria set forth in 34 CFR § 300.321(a)(6), which necessitates that:

[A] They possess demonstrable knowledge or special expertise regarding the child who is the subject of the meeting,

[B] Their knowledge or special expertise is relevant and necessary to address an item on the meeting's agenda,

[C] Their invitation is extended solely to facilitate discussion related to the relevant agenda item,

[D] Parents or guardians have the right to insist that the invitee is only present for the portion of the meeting corresponding to their invitation;

b. An injunction ordering Defendants to adhere to the statutory requirements for IEP team composition as outlined in 34 CFR § 300.321(a)(6) as interpreted in the declaration judgment request above;

c. Any further relief that this Court deems just and equitable.

**Ninth Cause of Action: Violation of Privacy Rights and Retaliation**

Plaintiffs were keeping EC home from school, citing Maine statute Title 20-A, section 3272(3)(A), which allowed absences for "Personal health, including the person's physical, mental, and behavioral health."

Plaintiffs relied on state law and their belief in the privileged nature of medical information to assert their right to provide only the statutory reason for EC's absences without divulging additional medical details.

Defendants demanded that Plaintiffs obtain and share a doctor's note before considering EC's absences legally excused, intruding into Plaintiffs' rights as parents

and violating their privacy rights.

After Plaintiffs refused to comply with Defendants' demands for a doctor's note, Defendants retaliated by referring Plaintiffs to the Maine Department of Health and Human Services (H&HS) and labeling EC as "truant."

H&HS conducted a brief investigation and determined that EC was not truant, finding that Defendants had abused the process by referring Plaintiffs to H&HS as an attempt to harass them.

Defendants' demands for medical information, retaliation through the referral to H&HS, and labeling EC as "truant" constitute violations of Plaintiffs' privacy rights and retaliation under state law.

Plaintiffs suffered harm, including emotional distress and reputational harm, as a result of Defendants' actions.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of their privacy rights and retaliation.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of Plaintiffs' privacy rights and retaliating against them;

b. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' actions;

c. Attorney's fees and costs;

d. Any further relief that this Court deems just and equitable.

**Tenth Cause of Action: Violation of State Law - Unauthorized Demands for Doctor's Note**

Plaintiffs cited Maine statute Title 20-A, section 3272(3)(A) as the reason for EC's absences and believed they were not legally required to provide additional information.

Defendants' demands for Plaintiffs to obtain and share a doctor's note before considering EC's absences legally excused were not authorized under state law and exceeded the powers conferred upon the school district.

Defendants' reliance on a district policy that exceeded the powers conferred upon it by state law was inappropriate and unlawful.

Defendants made no effort to obtain legitimacy for the school board policy they relied upon, indicating that they were acting in bad faith when ignoring the daily notes provided by Plaintiffs.

Defendants further violated school policies by refusing to provide schoolwork to EC during her absences, despite the existence of a district policy allowing students who comply with the district's demand for a doctor's note to have schoolwork sent home. Additionally, the school district had a policy permitting students to use school-issued iPads for remote schoolwork.

Plaintiffs suffered harm, including emotional distress, reputational harm, harassment, and educational detriment, as a result of Defendants' unauthorized demands, denial of schoolwork, and violation of school policies.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of state law, unauthorized demands, denial of schoolwork, and violation of school policies.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of state law and school policies;

b. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' unauthorized demands, denial of schoolwork, and violation of school policies;

c. Attorney's fees and costs;

d. Any further relief that this Court deems just and equitable.

**Eleventh Cause of Action: Retaliation and Violation of School Policies - Referral to H&HS**

Plaintiffs cited Maine statute Title 20-A, section 3272(3)(A) as the reason for EC's absences and believed they were not legally required to provide additional information.

Defendants' demands for Plaintiffs to obtain and share a doctor's note before considering EC's absences legally excused were not authorized under state law and exceeded the powers conferred upon the school district.

After Plaintiffs refused to comply with Defendants' demands for a doctor's note, Defendants retaliated by referring Plaintiffs to the Maine Department of Health and Human Services (H&HS) and labeling EC as "truant."

H&HS conducted a brief investigation and determined that EC was not truant, finding that Defendants had abused the process by referring Plaintiffs to H&HS as an attempt to harass them.

Defendants' referral of Plaintiffs to H&HS and the labeling of EC as "truant" violated school policies and exceeded the powers conferred upon the school district.

Plaintiffs suffered harm, including emotional distress, reputational harm, harassment, and educational detriment, as a result of Defendants' unauthorized demands, referral to H&HS, and labeling EC as "truant."

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of school policies, state law, retaliation, referral to H&HS, and labeling of EC as "truant."

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of school policies and state law;

b. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' retaliation, referral to H&HS, and labeling of EC as "truant";

c. Attorney's fees and costs;

d. Any further relief that this Court deems just and equitable.

**Twelfth Cause of Action: Violation of the Americans with Disabilities Act (ADA) - Failure to Provide Reasonable Accommodation for Transportation**

Plaintiffs requested transportation for EC due to her disability, starting on October 11th, 2022. The household consisted of only EC and her disabled father, 'Klos'.

Defendants, through Superintendent Works, have never objected to providing EC with transportation. They are aware of their responsibility to provide transportation under the ADA. However, they failed to provide a reasonable accommodation for transportation, as required under the ADA. Instead, Defendants proposed a transportation plan that did not honor the "late start" accommodation, failed to address EC's specific needs, and constituted a clear danger to EC.

Defendants' proposed transportation plan conflicted with ADA accommodations agreed upon in a March 31, 2021 mediation agreement.

Defendants' transportation plan would have left EC 8 miles from home with no adult supervision and no means to reach her home safely, in direct opposition to district policies and safety standards.

Plaintiffs have suffered harm, including emotional distress and a denial of EC's right to access educational services and a Free Appropriate Public Education, as a result of Defendants' failure to provide a reasonable accommodation for transportation.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of the ADA and their failure to provide a reasonable accommodation for transportation for EC.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of the ADA and ADA accommodation agreement;

b. An injunction ordering Defendants to provide EC with appropriate transportation in accordance with ADA accommodations and safety standards;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' actions;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

## Thirteenth Cause of Action: Violation of Educational Rights - Denial of Access to Education

Plaintiffs requested transportation for EC due to her disability, starting on October 11th, 2022. The household consisted of only EC and her disabled father, 'Klos'.

Defendants have never objected to providing EC with transportation, and they are aware of their responsibility to provide transportation. However, Defendants' failure to provide transportation for EC has resulted in a denial of her access to education, violating her educational rights.

Defendants' actions are also in violation of ADA accommodations agreed upon in a March 31, 2021 mediation agreement.

Plaintiffs have suffered harm, including EC's inability to attend school, loss of educational opportunities, and emotional distress, due to Defendants' denial of access to education.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of EC's educational rights and ADA accommodation agreement, including the denial of access to education.

## Relief Sought:

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of EC's educational rights and ADA accommodation agreement;

b. An injunction ordering Defendants to provide EC with safe and appropriate transportation and access to education in accordance with ADA accommodations;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' actions;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Fourteenth Cause of Action: Violation of Educational Rights - Unlawful Declaration of Truancy**

Defendants have been obligated to provide EC with safe and appropriate transportation to and from school since October 11th, 2022, but have refused to do so.

For each day from October 11th, 2022, to the present, Defendants have marked EC absent and declared each day of absence as "unexcused," despite the fact that EC's absences are solely due to Defendants' refusal to provide safe transportation.

Declaring EC's absences as "unlawful" and EC as "truant" is inappropriate, as neither Klos nor EC have control over transportation options. EC remains on standby each day, ready to attend school once Defendants are willing to provide free and safe transportation.

Plaintiffs have suffered harm, including emotional distress, reputational harm, and a denial of EC's right to access educational services, as a result of Defendants' unlawful declaration of truancy.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of EC's educational rights by unlawfully declaring truancy.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of EC's educational rights by unlawfully declaring truancy;

b. An injunction ordering Defendants to provide EC with safe and appropriate transportation to school and back home;

c. Expungement of the "unexcused" absences from EC's record;

d. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' actions;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

## Fifteenth Cause of Action: Breach of Obligation - Failure to Provide Transportation

Defendants have been obligated to provide EC with safe and appropriate transportation to and from school since October 11th, 2022, but have refused to do so.

Defendants have breached their obligation to provide transportation to EC, as required by law. This breach has resulted in EC's inability to attend school and a violation of her educational rights.

Plaintiffs have suffered harm, including EC's inability to attend school, loss of educational opportunities, emotional distress, and reputational harm, as a result of Defendants' breach of obligation.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' breach of obligation in failing to provide transportation to EC.

## Relief Sought:

a. A declaratory judgment finding Defendants in breach of their obligation to provide transportation to EC;

b. An injunction ordering Defendants to provide EC with safe and appropriate

transportation to school and back home;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' breach;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

### Sixteenth Cause of Action: Violation of FERPA - Inaccurate Educational Records

Over the past 2 school years and the few weeks into a third school year, Defendants have marked EC's absences as unexcused and labeled EC as truant in her educational records. None of the reasons relied upon by Defendants are valid.

Defendants' inaccurate marking of EC's absences as unexcused and the label of truancy in her educational records constitute a violation of FERPA, which grants parents and eligible students the right to seek correction of inaccurate or misleading educational records.

Plaintiffs have requested a FERPA hearing from Defendants in order to challenge the accuracy of EC's educational records, specifically the classification of her absences as unexcused and her label as truant.

Defendants have failed to respond to Plaintiffs' request for a FERPA hearing. Additionally, Defendants indicated that the FERPA hearing would be held by the same individual(s) who made the determinations being challenged, which raises concerns about a conflict of interest.

Plaintiffs have suffered harm, including damage to EC's educational record, reputational harm, and emotional distress, as a result of Defendants' violations of FERPA.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of FERPA by inaccurately maintaining EC's educational records.

### Relief Sought:

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of FERPA by maintaining inaccurate educational records for EC;

b. An injunction ordering Defendants to hold a FERPA hearing conducted by an impartial party to review the accuracy of EC's educational records (unless moot);

c. Corrective action to amend EC's educational records to accurately reflect her absences;

d. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' violations of FERPA;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

## Seventeenth Cause of Action: Denial of Due Process - Refusal to Provide FERPA Hearing

Plaintiffs have requested a FERPA hearing from Defendants to challenge the accuracy of EC's educational records, specifically the classification of her absences as unexcused and her label as truant.

Defendants have refused to provide a FERPA hearing, denying Plaintiffs their right to due process under FERPA, which includes the opportunity to challenge the accuracy of educational records.

Defendants have indicated that the FERPA hearing would be conducted by the same individual(s) who made the determinations being challenged, creating a conflict of interest.

Plaintiffs have suffered harm, including damage to EC's educational record, reputational harm, and emotional distress, as a result of Defendants' denial of due process.

Plaintiffs respectfully request that this Court find in their favor and provide the

requested relief to remedy Defendants' violation of due process rights under FERPA by refusing to provide a FERPA hearing.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of due process rights under FERPA by refusing to provide a FERPA hearing;

b. An injunction ordering Defendants to provide a FERPA hearing conducted by an impartial party to review the accuracy of EC's educational records (unless moot);

c. Corrective action to amend EC's educational records to accurately reflect her absences;

d. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' denial of due process;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

**Eighteenth Cause of Action: Violation of Educational Rights - Failure to Provide Appropriate Educational Materials**

EC has not attended a public school classroom setting since participating in a distance learning session during the COVID-19 pandemic lockdown. Defendants have failed to provide EC with appropriate learning materials at home when she is not at school, despite school policies stating that students are entitled to school work sent home for completion.

Defendants' refusal to provide EC with learning materials while she is absent from school constitutes a violation of EC's educational rights. This failure has resulted in EC's inability to access educational opportunities for over two years.

Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, and reputational harm, as a result of Defendants' failure to provide

appropriate educational materials.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violations of EC's educational rights by failing to provide appropriate educational materials during her absence.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants in violation of EC's educational rights by failing to provide appropriate educational materials during her absence;

b. An injunction ordering Defendants to provide EC with appropriate learning materials and support to facilitate her education while absent from school;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' violations of EC's educational rights;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Nineteenth Cause of Action: Inappropriate Grade Promotion - Negligent Promotion**

EC has not attended a public school classroom setting since participating in a distance learning session during the COVID-19 pandemic lockdown. Despite over two years of absence and no testing, Defendants have inappropriately promoted EC to the eighth grade.

Defendants' promotion of EC to the eighth grade, despite her prolonged absence and lack of educational assessment, constitutes negligent promotion. This negligent action may have been taken to avoid addressing the two years of missed education.

Plaintiffs have suffered harm, including EC's placement in an inappropriate grade level and the potential for educational gaps, as a result of Defendants' negligent promotion.

Plaintiffs respectfully request that this Court find in their favor and provide the

requested relief to remedy Defendants' negligent promotion of EC to an inappropriate grade level.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants negligent in promoting EC to the eighth grade without appropriate assessment or justification;

b. An injunction ordering Defendants to reevaluate EC's grade placement and provide appropriate educational support to address any gaps in her education;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' negligent promotion;

d. Compensatory education for the harm suffered by Plaintiffs as a result of Defendants' negligent promotion;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable;

## Twentieth Cause of Action: Deliberate Indifference - Violation of Title 42 Section 1983

Throughout October and November 2022, Klos requested Defendants to provide transportation and accommodations for EC to receive a Free Appropriate Public Education (FAPE). Klos contacted Commissioner Makin of the Maine Department of Education to intervene and assist with EC's transportation and accommodations. Klos sent multiple emails to Makin, fully informing her of the situation and requesting intervention.

Makin, as the Commissioner of the Maine Department of Education, was aware of Klos's repeated requests for assistance and the urgency of the situation. Despite receiving autoresponder confirmations of email receipt, Makin never responded in any way to Klos's communications. Plaintiffs believe that Makin's inaction and failure to respond, despite being fully informed of the situation, constitute deliberate indifference

to the educational needs and rights of EC, making her liable under Title 42 U.S.C. § 1983.

Plaintiffs have suffered harm, including EC's continued inability to access educational services, emotional distress, and reputational harm, as a result of Makin's deliberate indifference.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Commissioner Makin's deliberate indifference to EC's educational needs and rights.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Commissioner Makin liable under Title 42 U.S.C. § 1983 for deliberate indifference to the educational needs and rights of EC;

b. Compensatory damages for the harm suffered by Plaintiffs as a result of Makin's deliberate indifference;

c. An injunction ordering Commissioner Makin to promptly establish a grievance policy and system, enabling parents, guardians, and students to report and seek assistance for issues related to the Maine Department of Education that currently lack a designated procedure or escalation mechanism;

d. address EC's transportation and accommodation needs to ensure her receipt of a FAPE;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

**Twenty-first Cause of Action: Fraudulent Misrepresentation**

In response to Plaintiffs' discrimination complaint filed with MHRC, Defendants Wurgaft and Bessey submitted a response riddled with misrepresentations of key facts, including false statements and misleading descriptions of transportation services.

These misrepresentations were intended to deceive MHRC and undermine the legitimacy of Plaintiffs' complaint.

Defendants Wurgaft and Bessey engaged in fraudulent misrepresentation by knowingly making false statements and distortions of facts in their response to the discrimination complaint. Their actions were intended to deceive MHRC and influence the dismissal of the complaint.

Defendants Wurgaft and Bessey engaged in fraudulent misrepresentation by knowingly making false statements and distortions of facts in their response to the discrimination complaint. Their actions were intended to deceive MHRC and influence the dismissal of the complaint.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants Wurgaft and Bessey's fraudulent misrepresentation in responding to the discrimination complaint.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants Wurgaft and Bessey liable for fraudulent misrepresentation in responding to the discrimination complaint filed with MHRC;

b. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' fraudulent misrepresentation;

c. An injunction ordering Defendants Wurgaft and Bessey to refrain from engaging in further fraudulent misrepresentations in any future responses or communications related to the discrimination complaint;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Twenty-second Cause of Action: Conspiracy to Violate Civil Rights**

Throughout the matters complained about in this complaint, Plaintiffs believe

Defendants Wurgaft and Bessey were actively advising each defendant on how to act with regards to EC at every step. Plaintiffs believe that Wurgaft and Bessey's actions have contributed extensively to the denial of EC and her parents' rights and education. Plaintiffs have included a "John Doe" defendant to represent the identity of additional persons who may have advised CRCS or its employees inappropriately.

Plaintiffs allege that Defendants Wurgaft and Bessey conspired with other unidentified individuals, including "John Doe," to violate EC and Klos's civil rights by advising CRCS and its employees to take actions that were not in EC's best interests, particularly with regard to the Individuals with Disabilities Education Act (IDEA) and accommodation requests under the Americans with Disabilities Act (ADA).

Plaintiffs have suffered harm, including the denial of EC and her parents' rights, improper handling of accommodation requests, and continued educational challenges, as a result of the alleged conspiracy to violate civil rights.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy the alleged conspiracy to violate their civil rights.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants Wurgaft and Bessey, along with "John Doe," liable for conspiracy to violate civil rights;

b. Compensatory damages for the harm suffered by Plaintiffs as a result of the alleged conspiracy;

c. An injunction ordering Defendants Wurgaft and Bessey, along with "John Doe," to cease any actions or advice that contribute to the violation of EC and Klos's civil rights;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Twenty-third Cause of Action: Violation of EC's Religious Accommodation Rights**

During the months when EC was home from school, there were three different reasons for her absences. One of the reasons was "observance of a recognized religious holiday when the observance is required during the regular school day." Plaintiffs provided Defendants with a written note indicating the days and the reason stated above. However, Defendants have refused to acknowledge this reason, considering these days as unexcused absences.

Plaintiffs allege that Defendants' refusal to acknowledge and correct EC's absences due to the observance of a recognized religious holiday constitutes a violation of EC's religious accommodation rights under applicable laws and regulations.

Plaintiffs have suffered harm, including the improper classification of EC's absences, potential academic consequences, and the denial of EC's religious accommodation rights, as a result of Defendants' refusal to acknowledge and correct these absences.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' violation of EC's religious accommodation rights.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants liable for violating EC's religious accommodation rights;

b. An order directing Defendants to correct EC's educational records to reflect the excused nature of her absences due to the observance of a recognized religious holiday;

c. An injunction ordering Defendants to honor EC's religious accommodation rights in the future and to cease classifying such absences as unexcused;

d. Compensatory damages for the harm suffered by Plaintiffs as a result of the violation of EC's religious accommodation rights;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

**Twenty-fourth Cause of Action: Breach of Mediation Agreement - Late Start Accommodation**

Paragraph 1 of the Mediation Agreement states, "The school and the parents will develop a plan to allow late start for the child within the policies of the school building." The meaning of "late start" was well understood by all parties at the time of the Mediation Meeting, even if not articulated in precise legal terms.

Plaintiffs allege that Defendants have breached the Mediation Agreement by consistently failing to honor and respect the "late start" accommodation as agreed upon. The breaches include:

A. Failure to Implement Late Start Plan:

Defendants have never developed or implemented a plan to allow for the "late start" accommodation within the policies of the school building.

B. Non-Compliance with Tracking and Attendance:

Defendants have made no changes to their tracking of EC's attendance to reflect the "late start" accommodation.

C. Ignoring Late Start in Transportation Scheduling:

Defendants have consistently ignored the "late start" accommodation when scheduling transportation for EC and have argued against its validity when Plaintiffs raised the issue.

D. False Reporting and Mischaracterization:

Defendants falsely informed the US Department of Education Office of Civil Rights that the "late start" accommodation was connected to a different accommodation request, and that the matter pertaining to it was resolved by the Mediation Agreement parties agreed to on March 31, 2021. Defendants's statements fraudulently induced the OCR to dismiss Plaintiffs' complaint under false pretenses.

Defendants grossly mischaracterized the facts when responding to Plaintiffs' discrimination complaint with the Maine Human Rights Commission.

E. Consistent Non-Compliance:

Throughout discussions with Defendants, they have never acted in a manner consistent with honoring and respecting the "late start" accommodation agreed upon at the Mediation Meeting.

Plaintiffs have suffered harm as a result of Defendants' breach of the "late start" accommodation, including the denial of EC's right to a modified start time that was agreed upon to meet her specific needs.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' breach of the "late start" accommodation in the Mediation Agreement.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants liable for breaching the "late start" accommodation in the Mediation Agreement;

b. An order directing Defendants to honor and respect the "late start" accommodation for EC for as long as the "late start" accommodation is appropriate;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' breach;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Twenty-fifth Cause of Action: Breach of Mediation Agreement - Failure to Arrange for a Legitimate FBA**

Paragraph 2 of the Mediation Agreement states, "The School shall arrange for a Functional Behavioral Analysis to evaluate the student's issues with morning starts to

the school day, and the results will be shared and discussed with the parents to develop a plan for the student."

Plaintiffs allege that Defendants have breached the Mediation Agreement by failing to arrange for a legitimate Functional Behavioral Analysis (FBA) as specified in the agreement. The breaches include:

A. Claimed Necessity of FBA:  Defendants have claimed that an FBA is necessary to legitimize the "late start" accommodation, even though the Mediation Agreement does not suggest or infer such a connection between the FBA and the accommodation.

B. Lack of a Proper FBA:  Defendants have not proposed or conducted a Functional Behavioral Analysis (FBA) that aligns with the IDEA's requirements for an FBA.

C. Lack of Explanation:  Defendants have failed to explain why the "late start" accommodation was deemed unacceptable or why an FBA was necessary to legitimize the accommodation.

D. Failure to Fulfill the Agreement:  Despite asserting that an FBA would assist in developing a plan for EC's morning starts, Defendants have not fulfilled their obligation to arrange for a legitimate FBA.

E. Unauthorized Request for Privileged Information:  Plaintiffs assert that Defendants' request and intent for an FBA may have crossed into an attempt to obtain privileged medical information from Plaintiffs regarding EC and her family, which is not within the scope of a legitimate FBA.

Plaintiffs have suffered harm as a result of Defendants' failure to arrange for a legitimate FBA, including the denial of EC's right to have her morning start issues properly evaluated and addressed within the scope of the Mediation Agreement.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' breach of the Mediation Agreement regarding the arrangement of a legitimate Functional Behavioral Analysis (FBA).

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants liable for breaching the agreement by failing to arrange for a legitimate Functional Behavioral Analysis (FBA);

b. An order directing Defendants to arrange for a legitimate FBA that aligns with the IDEA's requirements and does not seek unauthorized privileged medical information OR Defendants admit that there is and never was a true need for a FBA;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' breach;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Twenty-sixth Cause of Action: Breach of Mediation Agreement - Failure to Develop IEP Meeting Agendas with Parent Participation**

Paragraph 5 of the Mediation Agreement reads, "At IEP meetings, the school will develop an agenda with the participation of the parents. After the meeting, the school shall provide a Written Notice documenting the discussion and the responses to the parents' concerns and/or requests."

Plaintiffs allege that Defendants have breached the Mediation Agreement by failing to develop IEP meeting agendas with the participation of parents, as clearly intended by the agreement. The breaches include:

A. Denial of Parent Participation:

Defendants have routinely denied parents' participation in the development of IEP meeting agendas, effectively excluding them from this critical step in the IEP process.

B. Rejection of Parent-Requested Agenda Items:

Plaintiffs have requested the inclusion of various concerns, issues, and matters of discussion in the IEP meeting agendas, such as food choices for EC, which were consistently rejected by Defendants.

C. Failure to Prepare Agendas in Advance:

Defendants have not prepared IEP meeting agendas in advance with parent participation, contrary to the agreement's intent that the agenda preparation occur before the meetings.

D. Violation of Parental Rights:

Defendants' refusal to involve parents in agenda development infringes upon parents' rights to actively participate in the IEP process as mandated by the IDEA.

Plaintiffs have suffered harm as a result of Defendants' failure to develop IEP meeting agendas with parent participation, including the denial of their ability to address crucial concerns and issues related to EC's education and well-being.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' breach of the Mediation Agreement regarding the development of IEP meeting agendas with parent participation.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants liable for breaching the agreement by failing to develop IEP meeting agendas with parent participation;

b. An order directing Defendants to adhere to the terms of the Mediation Agreement by actively involving parents in the development of IEP meeting agendas;

c. Any compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' breach;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Twenty-seventh Cause of Action: Breach of Mediation Agreement - Failure to Reschedule IEP Meetings**

Paragraph 7 of the Mediation Agreement reads, "If the parents express a reasonable reason for not being able to attend a scheduled meeting, the school will agree to

reschedule the meeting, provided that the parents cooperate to reschedule meetings and that a rescheduled meeting can be held within the requirements and timelines identified in MUSER. The school shall provide citations to those timelines when they are an issue. The parents agree to respond to communications from the school within three business days."

A.    Denial of Rescheduling Request on November 26, 2021:

Defendants refused to reschedule an "IEP Annual Review" meeting on November 26, 2021, when Plaintiffs found they were unable to attend on short notice and communicated these circumstances to Defendants. Defendants proceeded with the meeting without Plaintiffs, denying Plaintiffs their right to be present and participate.

B.    Rescheduling with Incorrect Address:

In the Fall of 2022, when Klos was unable to attend the initially scheduled meeting, Defendants rescheduled the meeting and sent notice to an address that Klos had never maintained. Defendants conducted the "IEP Triannual Review" without Plaintiffs present and used the unavailability of a current evaluation of EC as an excuse to revoke EC's eligibility for special education services under the IDEA.

C.    Misleading Adverse Action Form:

Defendants used an adverse action form to justify the revocation of EC's special education services, which contained incorrect, out-of-context, or inappropriate information. Defendants completed this form with information intended to support their desired outcome—the revocation of EC's special education eligibility

Plaintiffs have suffered harm as a result of Defendants' refusal to reschedule IEP meetings, including the denial of their right to participate in crucial IEP meetings that impact EC's education and the improper revocation of EC's special education eligibility.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' breach of the Mediation Agreement regarding the rescheduling of IEP meetings.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants liable for breaching the agreement by failing to reschedule IEP meetings when reasonable reasons were presented by the parents;

b. A declaratory judgment stating that the above meetings are void, and an order that the documents defendants drafted from and at these meetings must be expunged from EC's educational record,

c. An order reinstating EC's special education eligibility and directing defendants to take appropriate action to determine the current appropriate special education services and accommodations for EC;

d. An order directing Defendants to adhere to the terms of the Mediation Agreement by rescheduling meetings when parents express reasonable reasons for non-attendance;

e. Any compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' breach;

f. Attorney's fees and costs;

g. Any further relief that this Court deems just and equitable.

### Twenty-eighth Cause of Action: Breach of Mediation Agreement - Failure to Exclude Current Special Education Director from IEP Meetings

Paragraph 8 of the Mediation Agreement reads, "The school district agrees to have all future IEP meetings with the administrator participating being personnel other than the current Special Education Director."

Plaintiffs allege that Defendants have breached the Mediation Agreement by failing to exclude the current Special Education Director from participating in IEP meetings as stipulated in paragraph 8. The breaches include:

A. September 30, 2021 Meeting:

Defendants had the new Director of Special Education, Susan Walters, attend and

largely conduct the IEP meeting held on September 30, 2021, despite Plaintiffs' understanding that the "current Special Education Director" was not supposed to be present.

B. Subsequent IEP Meetings:

Defendants continued to have the current Special Education Director present and conduct all subsequent IEP meetings held for EC, including meetings on November 26, 2021, and December 6, 2022, thereby violating the terms of Mediation Agreement paragraph 8.

The inclusion of paragraph 8 in the Mediation Agreement was motivated by concerns over the backlog of IEP meetings due to the requirement for the Special Education Director's attendance. Defendants agreed to exclude the current Special Education Director from participating in IEP meetings, with the intention of addressing this backlog issue and ensuring future IEP meetings proceeded efficiently.

Plaintiffs have suffered harm as a result of Defendants' failure to exclude the current Special Education Director from participating in IEP meetings, including confusion, inefficiency, and the frustration of their reasonable expectations under the Mediation Agreement.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to remedy Defendants' breach of the Mediation Agreement regarding the exclusion of the current Special Education Director from IEP meetings.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment finding Defendants liable for breaching the agreement by failing to exclude the current Special Education Director from participating in IEP meetings as required by paragraph 8;

b. An order directing Defendants to adhere to the terms of the Mediation Agreement by excluding the current Special Education Director from IEP meetings and appointing other qualified personnel to fulfill this role;

c. Any compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' breach;

d. Attorney's fees and costs;

e. Any further relief that this Court deems just and equitable.

**Twenty-Ninth Cause of Action: Discrimination and Retaliation under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA)**

Throughout the events described in this complaint, it was evident to Defendants that Plaintiffs were coping with extreme anxiety, which was openly shared with Defendants since initial meetings in 2018.

Plaintiffs believe that many of Defendants' actions, particularly those listed below, were intentionally aimed at exacerbating their anxiety:

[A].    Email exchanges regarding EC's truancy and Defendants' determination that EC's absences were unexcused.

[B]    Email exchanges concerning safe transportation for EC, where Plaintiffs requested appropriate and safe transportation.

[C]    Discrimination complaints filed with the US Department of Education, Office of Civil Rights, and Defendants' responses, which Plaintiffs perceive as fraudulent.

[D]    Discrimination complaint submitted to MHRC, along with Defendants' response to it, which Plaintiffs again view as fraudulent.

[E]    Violation of the Mediation Agreement, where Defendants explicitly refused to respect and honor the terms of the agreement.

Defendants' actions, as described above, constitute violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., due to discrimination and retaliation based on Plaintiffs' anxiety.

Plaintiffs respectfully request that this Court find in their favor and provide the

requested relief to rectify Defendants' violations of Section 504 of the Rehabilitation Act and the ADA, stemming from their discriminatory and retaliatory actions against Plaintiffs based on their anxiety.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. A declaratory judgment stating that Defendants violated Section 504 of the Rehabilitation Act and the ADA;

b. An injunction ordering Defendants to cease discriminatory and retaliatory actions against Plaintiffs;

c. Compensatory damages for the harm suffered by Plaintiffs as a result of Defendants' actions;

d. Punitive damages, as appropriate, due to Defendants' willful and malicious conduct;

e. Attorney's fees and costs;

f. Any further relief that this Court deems just and equitable.

**Thirtieth Cause of Action: Intentional Infliction of Emotional Distress**

Throughout the events described in this complaint, it was evident to defendants that plaintiffs were coping with extreme anxiety, a condition that was openly shared with defendants since initial meetings in 2018.

Plaintiffs allege that Defendants intentionally engaged in actions, such as those listed below, with the awareness and intent to exacerbate Plaintiffs' anxiety:

[A].    Email exchanges regarding EC's truancy and Defendants' determination that EC's absences were unexcused.

[B].    Email exchanges concerning safe transportation for EC, where Plaintiffs requested appropriate and safe transportation.

[C].    Discrimination complaints filed with the US Department of Education, Office of

Civil Rights, and Defendants' responses, which Plaintiffs perceive as fraudulent.

[D].     Discrimination complaint submitted to MHRC, along with Defendants' response to it, which Plaintiffs again view as fraudulent.

[E].     Violation of the Mediation Agreement, where Defendants explicitly refused to respect and honor the terms of the agreement.

Plaintiffs contend that Defendants' conduct meets the elements required for intentional infliction of emotional distress, including intentional or reckless conduct, extreme and outrageous behavior, causation, and severe emotional distress suffered by Plaintiffs.

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief for the intentional infliction of emotional distress caused by Defendants' conduct.

**Relief Sought:**

Plaintiffs respectfully request that this Court grant the following relief:

a. Damages for the severe emotional distress suffered by Plaintiffs due to Defendants' intentional infliction of emotional distress;

b. Punitive damages, as appropriate, to deter similar conduct by Defendants in the future;

c. Attorney's fees and costs;

d. Any further relief that this Court deems just and equitable.

**Conclusion**

Plaintiffs respectfully request that this Court find in their favor and provide the requested relief to rectify each of plaintiffs' causes of action.

We affirm that the foregoing is true and correct under the penalty of perjury.

**Dated:  September 27, 2023**

Thomas Kes

Plaintiff pro se

Yesenia Guzman

Plaintiff pro se